IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 11, 2008  Session

# FOSTER BUSINESS PARK, LLC., ET AL. v. MARK WINFREE, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 04-319-I    Claudia Bonnyman, Chancellor**

---

**No. M2006-02340-COA-R3-CV - Filed January 15, 2009**

---

Maker and guarantors of promissory note brought action against various parties including the maker's former loan officer, the former holder of the note, and the current holder of the note, alleging that defendants breached their fiduciary duty to the maker, tortiously interfered with the maker's negotiations to pay off the note at a discount and violated the Tennessee Consumer Protection Act.  The Chancery Court for Davidson County granted defendants' summary judgment. Maker and guarantors appealed.  Finding no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., J., and ROBERT W. WEDEMEYER, SP.J., joined.

Barry L. Gardner and Charles G. Blackard, III, Brentwood, Tennessee, for the appellant, Foster Business Park, Arte' Corp., Tarun Surti and Lata Surti.

Sam J. McAllester, III and William J. Haynes, III, Nashville, Tennessee, for the appellee, Billy Lowe and J&B Investments, LLC.

Daniel W. Small and Paul Allen England, Nashville, Tennessee, for the appellee, Mark Winfree and American Holdings Investments, Inc.

## OPINION

### I.  Procedural History and Facts

#### A.

The Plaintiffs, debtor under a promissory note and guarantors of the promissory note, filed the present action on January 30, 2004, against Mark Winfree, the Plaintiffs' former loan officer, American Holdings Investments, Inc. ("AHI"), a purchaser of the note, J&B Investments, LLC

("J&B Investments"), holder of the note, and J&B Investments' principal owners Billy Lowe and Jerry Swords[1] alleging breach of fiduciary duty and civil conspiracy to breach the fiduciary duty, intentional interference with a business relationship and civil conspiracy to interfere with a business relationship, and violation of the Tennessee Consumer Protection Act ("TCPA") and civil conspiracy to violate the TCPA in Davidson County Chancery Court. There were two other financial institutions – The Bank of Nashville ("TBON") and First State Bank ("First State") – involved in the underlying transactions, but neither were made parties to this litigation.[2]

On November 24, 2004, Mr. Winfree and AHI filed a Motion for Partial Dismissal pursuant to Tenn. R. Civ. P. 12.02(6) of the claims of breach of fiduciary duty, civil conspiracy to breach the fiduciary duty, and violation of the TCPA. On January 5, 2005, the trial court dismissed the claims against AHI for breach of fiduciary duty and violation of the TCPA. The trial court also partially dismissed the breach of fiduciary duty claim against Mr. Winfree with respect to "actions he carried out by or on behalf of a financial institution and/or in the scope and course of his duties as an officer or employee of a financial institution, including the [sic] Bank of Nashville and/or First State Bank."[3]

Following discovery Mr. Winfree and AHI filed a Motion for Summary Judgment. After a hearing, the trial court partially granted the motion by dismissing the remaining breach of fiduciary duty claim against Mr. Winfree, finding that Mr. Winfree was not a fiduciary with respect to any of the plaintiffs; the trial court took the remainder of the motion under advisement. On July 17, 2006, the trial court granted the remainder of Mr. Winfree and AHI's Motion for Summary Judgment finding no genuine issue of material fact and concluding that neither Mr. Winfree nor AHI were the cause of Foster's or Mr. Surti's damages under the two remaining claims – intentional interference with a business relationship and violation of TCPA. On July 27 and 28, 2006, Mr. Lowe and J&B Investments filed Motion to Alter or Amend the court's Memorandum and Order of Dismissal to include Mr. Lowe and J&B Investments in the dismissal and Motion for Summary Judgment,

_____

[1] Jerry Swords filed a Motion to Dismiss pursuant to Tenn. R. Civ. P. 12.02(6) on March 24, 2004, but before the motion was heard Mr. Surti filed a Notice of Non-Suit voluntarily dismissing Mr. Swords as a defendant. Mr. Surti then filed a Motion to Amend on April 2, 2004, in order to file an Amended Complaint containing additional factual allegations against Mr. Swords. On April 22, 2004, the trial court entered an order which granted Mr. Surti's voluntary non-suit as to Mr. Swords.

[2] The Plaintiffs filed a Second Motion to Amend on February 1, 2005, which would have amended the complaint by adding TBON as an additional party, adding the claim of usury against J&B Investments and a claim of misrepresentation against Mr. Winfrey. The Defendants filed Responses opposing the Plaintiffs' Second Motion to Amend; the record does not reflect an order disposing of Plaintiffs' motion. There was previous litigation in which Foster Business Park filed suit against J&B Investments and TBON claiming J&B Investments and TBON had charged and were attempting to collect a usurious rate of interest. That case was dismissed by the trial court pursuant to Tenn. R. Civ. P. 12.02(6), which was subsequently affirmed by this Court. *See Foster Business Park, LLC v. J&B Investments, LLC*, 2008 WL 269509, ___ S.W.3d ___ (Tenn. Ct. App. Jan. 30, 2008).

[3] The trial court dismissed the breach of fiduciary duty claim to the extent that the claim was based on Mr. Winfree as Mr. Surti's and Foster's banker. Tenn. Code Ann. § 45-1-127 provides that bank officers are not fiduciaries of their bank clients absent a specific agreement creating such a relationship. There was no specific agreement between the Plaintiffs, Mr. Surti or Foster Business Park, and Mr. Winfree in this regard.

respectively. On October 9, 2006, the trial court entered Agreed Order of Dismissal, which dismissed the action with regard to all Defendants.

The issues on appeal are whether the trial court erred by partially dismissing the Plaintiffs' claim of breach of fiduciary duty pursuant to Tenn. R. Civ. P. 12.02(6) and whether the trial court erred by granting summary judgment to Defendants with respect to the remaining claims.[4]

**B.**

The individual parties in this case, Tarun Surti, Mark Winfree and Billy Lowe, have been acquaintances since the early 1990s when Mr. Surti began his first business. At the time, Mr. Winfree worked for the State of Tennessee development office and Mr. Lowe worked for a small business development non-profit agency. Mr. Winfree and Mr. Lowe offered Mr. Surti advice in starting a new business including helping him prepare a business plan and seek financing. Mr. Surti alleges that the three were close friends, that they traveled extensively with one another as they sought potential lenders for Mr. Surti's business, and that Mr. Winfree was his "mentor." Mr. Surti believed that he had developed a special relationship of trust with Mr. Winfree and Mr. Lowe because he felt comfortable sharing his personal and business information with them. Mr. Winfree and Mr. Lowe, however, contend that they never had more than a typical business relationship with Mr. Surti.

In 1997, Mr. Surti approached Mr. Winfree, who had since joined TBON as a loan officer, about obtaining a $1.5 million loan for Foster Business Park LLC ("Foster"), a company principally owned and managed by Mr. Surti, to purchase property located at 1111 Foster Avenue, Nashville, Tennessee ("Foster Property"). TBON approved the loan and Mr. Surti signed a Construction and Term Loan Agreement ("Loan Agreement") with TBON on behalf of Foster. Foster executed a Promissory Note ("the Note") in a principal amount not to exceed $1.5 million (collectively, "Foster Loan"), which was secured by a Deed of Trust on the Foster Property, a Security Agreement, an Assignment of Rents and Leases, a Fixture Filing, and a Guaranty Agreement signed by Mr. Surti, Lata Surti (Mr. Surti's wife), and Arte Corporation ("Arte'"), a company owned by Mr. Surti and Foster's sole tenant at the Foster Property (collectively, "Guarantors"). Mr. Surti testified in his deposition that he understood that when TBON made the Foster Loan that Mr. Winfree was working for TBON and representing the bank's interests.

In 2000, Arte's business began to decline and on March 23, 2000, Foster executed a Change in Terms Agreement with TBON through Mr. Winfree, the loan officer for the initial transaction. The agreement reduced the principal of the Note to $1.4 million and changed the repayment schedule. The Foster Loan was set to mature and become due and fully payable on December 20,

---

[4] In asserting error by the trial court on appeal, Plaintiffs do not distinguish between the Tenn. R. Civ. P. 12.02(6) partial dismissal of the breach of fiduciary duty claim as it related to Tenn. Code Ann. § 45-1-127 and the Summary Judgment dismissal of the remaining part of the breach of fiduciary duty claim against Mr. Winfree. For the purpose of clarity, we will review the Rule 12 dismissal separately from the dismissal on Summary Judgment.

2002. Some time during 2002, Mr. Surti negotiated the sale of Arte's assets after which Arte ceased making rent payments to Foster.[5] Foster did not find another tenant for the Foster Property and Mr. Surti approached Mr. Winfree in August 2002, about renewing the Foster Loan for a five-year term with a lower interest rate and interest-only payments in the first year. Mr. Surti contends that Mr. Winfree agreed that TBON would refinance the Foster Loan before its maturity date and that he told Mr. Surti that Foster need not make any more payments on the Foster Loan. Mr. Winfree denied making either statement in his deposition. The language of the Note states that "neither the terms of the Loan nor this Note may be modified, extended, changed, amended or terminated except in writing" and nothing in the 2000 Change in Terms Agreement altered this provision. Foster failed to pay the principal and interest due on September 20, 2002, and did not make any further payments on the Foster Loan.

In December 2002, Mr. Winfree left TBON to join First State as senior vice-president in charge of commercial lending. The Foster Loan was transferred to another TBON loan officer, Orlandus Major. Mr. Surti testified in his deposition that Orlandus Major also told him that he did not have to make any payments on the Foster Loan. Around the first of January 2003, TBON transferred the Foster Loan to its special assets division responsible for servicing "seriously delinquent accounts" and its special assets officer, Ellen Hackett, contacted Mr. Surti to propose a forbearance agreement ("First Forbearance Agreement") in order to prevent foreclosure. The proposed forbearance agreement would allow Foster to make "interest only" payments for a period of 6 months at 8.5%. Mr. Surti requested that TBON reduce the interest rate to 4.5%, which was TBON's prime rate at the time. Ms. Hackett told Mr. Surti that TBON could not agree to the application of the prime rate and the negotiations on the First Forbearance Agreement ceased.

Following the breakdown of the First Forbearance Agreement negotiations, Mr. Surti met with TBON President, Hunter Atkins, to discuss the delinquency status of the Foster Loan. Mr. Surti told Mr. Atkins that he was having cash flow problems and was unable to service the debt. TBON provided Mr. Surti with three names to contact regarding auctioning the property. Ms. Hackett wrote in the January 31, 2003, Criticized Asset Report for the Foster Loan that Mr. Surti had agreed to obtain proposals and enter an agreement to have the Foster Property auctioned. However, by the end of January 2003, and after continued delays Ms. Hackett felt that Mr. Surti was misleading her about his intentions to auction the property and was merely stalling; therefore, on January 31, TBON sent Foster a demand letter requiring full payment of the Foster Loan by February 10 or it would initiate foreclosure proceedings, which the bank tentatively set for March 15. Mr. Surti asserted in his deposition and his Affidavit that he never intended to sell the Foster Property. He did, however, apparently communicate with at least one auction company, Furrow Auction Company, in January 2003, because he received an appraisal letter that determined the fair market value of the Foster

---

[5] Apparently Mr. Surti completed a transaction which sold the assets of Arte' to a company in Mexico. In August 2002, Mr. Surti told Mr. Winfree that he was having trouble getting the payments from the sale of assets transactions and apparently was involved in some litigation to resolve the dispute with the Mexican company. The record does not indicate how or whether that dispute was resolved.

Property was between $1.3 and $1.6 million and the liquidation value between $822,000 and $1 million.[6]

During the month of January 2003, and while Mr. Surti was engaged in the above described communications with TBON, Mr. Surti pursued various other options to pay off the Foster Loan. Mr. Surti hired a broker to help him find financing from various financial institutions, but he also approached Mr. Winfree, now at First State, about whether First State could refinance the Foster Loan. Mr. Surti told Mr. Winfree that the Foster Loan was in default, that he was still having cash flow problems and that TBON had begun the process of foreclosure. He did not, however, provide Mr. Winfree with any financial information about Foster or the Furrow Auction Company appraisal of the Foster Property. Mr. Winfree advised Mr. Surti that First State could not provide financing since Foster had no identifiable cash flow and that Mr. Surti's best option was to sell the building. Mr. Winfree suggested Mr. Surti connect with Mr. Lowe who often helped businesses find financing through his business consultancy, Southern Business Group. Mr. Winfree told Mr. Lowe that Mr. Surti might be able to use Mr. Lowe's assistance and asked whether Mr. Lowe had time to take on another client. Mr. Lowe indicated that he was interested.

Based on his conversation with Mr. Winfree, Mr. Lowe contacted Mr. Surti and the two met at the Foster Property in early January 2003. Mr. Surti gave Mr. Lowe a tour of the facility and described his situation. Mr. Surti told Mr. Lowe that Foster did not have a tenant for the building; that Mr. Surti had some health issues; that Foster was past due in its payments and owed TBON approximately $1.2 Million on the Foster Loan; and that Mr. Surti had thus far been unable to refinance the Foster Loan. Mr. Lowe did not tell Mr. Winfree about what Mr. Surti told him nor did he ask Mr. Winfree to confirm any of the information that Mr. Surti told him. Mr. Lowe did not think Mr. Surti was likely to refinance the loan because Foster had no income, tenant or active operation and was six months behind on its payments; Mr. Surti, however, contends that Mr. Lowe told him that he felt "really strongly" that he could find financing. Mr. Surti and Mr. Lowe did not have a written agreement, but Mr. Lowe told Mr. Surti that he would "look around and see if [he] knew anybody that was interested in refinancing or acquiring [Mr. Surti's] warehouse." Mr. Lowe also looked for a possible tenant for the Foster Property and talked with a couple that had a molding business as well as to Mr. Swords about leasing space at the Foster Property. In a subsequent meeting between Mr. Surti and Mr. Lowe during January 2003, Mr. Surti told Mr. Lowe that "he was going to give the [Foster] property back to the bank, that he was - - he didn't want to deal with it;" Mr. Surti also told Mr. Lowe that he was considering auctioning the Foster Property or taking bankruptcy action to delay foreclosure by TBON. Mr. Lowe advised Mr. Surti to get an attorney's advice before taking any action and to make sure that Foster got a release so that if TBON sold the Foster Property for less than what Foster owed that they were not able to get a deficiency judgment against Foster and/or Mr. Surti.

---

[6] Mr. Surti did not share this valuation from Furrow Auction Company with TBON, Mr. Winfree or Mr. Lowe. However, TBON later received a copy of this appraisal report from its own appraiser, Pat McGuigan.

On February 6, 2003, Mr. Lowe chartered the company, Lowe & Associates, in order to have an entity through which to purchase the Foster Property.[7] Mr. Lowe asked Mr. Surti for a property valuation and Mr. Surti faxed him the first two pages of a 1997 appraisal of the Foster Property valuing the property at approximately $3.2 million. Mr. Surti did not provide Mr. Lowe with a copy of the more recent Furrow Auction Company valuation. Based on research of comparable warehouse sales prices and average per-foot prices in the area, Mr. Lowe valued the property somewhere between $1.7 million and $2 million, but he also believed that the building needed several hundred thousand dollars worth of repairs due to its poor condition – there were numerous leaks in the roof, water on the floor, insufficient roof lights, no walls in the office area, exposed wiring, missing ceiling tiles, water damage in some of the offices, carpet damage, and an inoperative elevator, among other things. Mr. Surti disputes that the building was in "poor condition." Some time during the first week of February 2003, Lowe & Associates made an offer, contingent on obtaining financing, to buy the building for "an amount sufficient to retire the Seller's existing obligation to [TBON] and to secure a complete unconditional release of indebtedness of the Seller and any personal guarantors on said indebtedness but in no event shall the Purchase Price exceed $1.4 million." On February 10, Mr. Surti rejected the offer telling Mr. Lowe that he wanted a written agreement without contingencies. Mr. Lowe then approached Mr. Winfree about securing financing from First State in order to buy the Foster Property.

Around the same time, Mr. Surti telephoned Mr. Winfree and told him that "he had to get out of the trap because [TBON] was about to take the building." Mr. Winfree believed after talking with both Mr. Lowe and Mr. Surti that they were close to a deal to sell the building and they both told him that he could use the information that he already had to see if he could get First State to approve the financing. Mr. Winfree then began working on a credit memorandum to submit to First State for approval. When Mr. Surti told Mr. Winfree that "[TBON] was coming down strong on the [N]ote and they weren't going to back off," Mr. Winfree thought that First State's purchase of the Note would stop the foreclosure and give Mr. Surti and Mr. Lowe time to get their deal done. However, because of the Foster Loan's delinquency status First State could not buy it without some assurance that the collateral would be purchased by Mr. Lowe. Mr. Winfree testified in his deposition that "the only way that I was even going to consider buying the [N]ote was if I had a signed purchase agreement between [Mr. Surti] and [Mr. Lowe]."

In mid-February, Mr. Winfree contacted Ms. Hackett at TBON to see whether TBON was willing to sell the Note. Ms. Hackett told Mr. Winfree that TBON was willing to sell the Note for $1,271,971.99 (the unpaid principal balance). Mr. Winfree testified in his deposition that he did not give this information to Mr. Lowe. On February 14, 2003, Ms. Hackett sent an email to Mr. Atkins informing him that First State had approved the purchase of the Foster Loan, but that the purchase was contingent on Mr. Surti's acceptance of an "unidentified transaction," *i.e.*, the sale of the Foster Property to Mr. Lowe. In anticipation of the sale of the Foster Loan to First State, Ms. Hackett sent Mr. Winfree a confidentiality agreement, which, if signed, would permit TBON to provide First State

---

[7] Lowe & Associates changed its name to J&B Investments, LLC, on April 15, 2003, after Mr. Jerry Swords became a member of the enterprise.

with confidential information about the Foster Loan. There is some dispute about whether Mr. Winfree actually signed the confidentiality agreement, but regardless both Mr. Winfree and Ms. Hackett testified that Ms. Hackett never provided Mr. Winfree with any of TBON's information on Foster or Mr. Surti or the fact that TBON was negotiating a forbearance agreement with Mr. Surti.[8] Ms. Hackett testified that all discussions between Ms. Hackett and Mr. Winfree were "arm's length," and that she never spoke to or had any contact with Mr. Lowe.

In anticipation that First State would be unable to purchase the Foster Loan from TBON because of limits on buying substandard, non-performing, loans, Mr. Winfree talked with the president of AHI, Eddie Cardin, about AHI purchasing the Foster Loan from TBON. AHI was at the time a subsidiary of First State and was created to buy such loans.[9] Mr. Carden expressed an interest in AHI purchasing the Foster Loan, but took no action at that time.

Towards the end of February 2003, Mr. Surti's broker put him in touch with Bruce Latimer, a commercial loan officer in Mr. Winfree's group at First State. Mr. Surti asked Mr. Latimer to come to his home on February 26, where Mr. Surti gave Mr. Latimer his personal financial statement and asked that it be kept confidential. Mr. Latimer did not know at the time that Mr. Winfree had already told Mr. Surti that First State could not finance the Foster Loan pay off. Mr. Latimer told Mr. Surti that he would need additional information on which to base a credit decision and two days later Mr. Surti faxed him the first two pages of his 2001 personal tax return. After reviewing these papers, Mr. Latimer advised Mr. Surti that First State could not help. Mr. Latimer told Mr. Winfree about his meeting with Mr. Surti including statements Mr. Surti made that he might sue Mr. Winfree, but Mr. Latimer did not share the financial statement or tax return Mr. Surti gave him with Mr. Winfree. Mr. Winfree told Mr. Latimer that Mr. Latimer could do his own analysis of the situation and that if Mr. Latimer felt that he could bring a proposal to the approval committee that Mr. Latimer was free to do so, but that Mr. Winfree did not want to see the information or be involved in the decision.

Some time during the last week of February, Mr. Surti sought to resume negotiations with TBON and began discussing another forbearance agreement ("Second Forbearance Agreement"). Mr. Surti offered $1 million to satisfy the Foster Loan and TBON countered with $1.2 million; however, TBON later agreed after Pat McGuigan, TBON's appraiser, provided Ms. Hackett with the

---

[8] The Plaintiffs point to Mr. Winfree's alleged failure to sign the confidentiality agreement as evidence that he disclosed confidential information about Mr. Surti and his companies, since, they suggest, otherwise he would have agreed to sign the agreement. We find no evidence upon which to draw such inferences. To the contrary, there is no evidence in the record to suggest that Mr. Winfree was given or otherwise obtained any confidential information about the Foster Loan, Foster, or Mr. Surti when he left TBON. Mr. Surti testified in his deposition that he did not give Mr. Winfree any confidential business information after Mr. Winfree joined First State. Ms. Hackett testified in her deposition that she did not give Mr. Winfree any confidential information about the Foster Loan. The fact that Mr. Winfree did not sign the confidentiality agreement with TBON is more indicative that First State did not intend to buy the Foster Loan from TBON.

[9] According to Mr. Winfree's deposition testimony, AHI was merged into First State at some point after AHI purchased the Foster Loan from TBON.

appraisal letter that Mr. Surti had received from the Furrow Auction Company, which determined that the liquidation value ranged from $822,000 to $1,096,000. The terms of the Second Forbearance Agreement required Mr. Surti to make an initial, non-refundable deposit payment of $200,000 by March 7 with the remaining $800,000 due by March 26.

On March 5, 2003, Ms. Hackett sent Mr. Surti an email with the wire transfer instructions for the funds due under the agreement. On March 6, Mr. Surti's and Foster's attorney, Joe Rusnak, sent TBON attorney, Charles Reasor, III, an email stating that Mr. Surti objected to certain language in paragraph 9 of the Second Forbearance Agreement relating to how the payoff would be reported to credit reporting agencies. Mr. Surti wanted the following language, "at the request of the Borrower, the Lender agrees to promptly notify all credit reporting agencies that the Indebtedness has been 'settled in full' and not charged off to bad debt."[10] Mr. Surti testified in his deposition that he was not willing to sign the Second Forbearance Agreement without his proposed language. Ms. Hackett testified in her deposition that TBON could not agree to Mr. Surti's proposed language because TBON was going to have to write off some of the Foster Loan as bad debt and TBON was not willing to make a false statement to the credit reporting agencies.

On Friday March 7, Ms. Hackett waited in her office to receive notification that the wire transfer had been received from Mr. Surti, but by the close of business Ms. Hackett had not heard from either Mr. Surti or his attorney nor had she received the $200,000 deposit. Ms. Hackett telephoned Mr. Reasor and told him that the forbearance negotiations with Mr. Surti were over and that the bank should take whatever action it could to collect the debt. On the following Monday, March 10, Mr. Reasor faxed a letter to Mr. Rusnak notifying him that the forbearance negotiations were being terminated and that TBON intended to move forward with foreclosure. TBON tentatively scheduled the foreclosure sale date for April 10, 2003. Ms. Hackett made note of these events in her February 28 Criticized Asset Report.[11]

Mr. Surti contends that there was no March 7 deadline and that Ms. Hackett merely wanted to find a way to end negotiations in order to sell the Foster Loan to Mr. Winfree. Mr. Surti attested that he felt ill on March 7 after working with a roofing contractor at the Foster Property and spent much of the day at Skyline Medical Center and was, thus, unable to discuss the Second Forbearance Agreement with his attorney. The Defendants asserted in their Statement of Undisputed Facts in support of their Motion for Summary Judgment that the hospital had no record of Mr. Surti's alleged visit on March 7 or any day between March 7 and March 10. Mr. Surti contends that the doctor he saw on March 7 was a family friend, but he provided no explanation for the lack of hospital records. Mr. Surti never attempted to resume negotiations, pay the deposit or sign the Second Forbearance Agreement on or after March 7.

---

[10] The original language proposed by TBON stated that, "in the event that Lender files a credit report to the credit agency regarding the Indebtedness, Lender shall report to such credit agency that the Indebtedness was 'settled in full.'"

[11] The Criticized Asset Report provides the status of delinquent notes, stating the outstanding balance as of the date of the document, but the text of the document may include events up to 10 days after the date of the report.

On March 12, Mr. Lowe sent Mr. Surti a second purchase offer; this time for the same price, but the offer was no longer contingent on Mr. Lowe obtaining financing. The offer stated the deadline for acceptance as March 14 at 3:00 p.m. Mr. Surti never responded to this offer. Mr. Winfree testified in his deposition that on either March 12 or 13, he told Mr. Cardin at AHI that it did not appear that Mr. Surti and Mr. Lowe were going to complete the sale of the Foster Property and, therefore, First State was "out." He told Mr. Cardin that if AHI wanted to continue with the purchase of the Foster Loan that was AHI's business.

Meanwhile, sometime during the week of March 10, Ms. Hackett at TBON began communicating with Mr. Cardin at AHI about a purchase agreement on the Foster Loan; the sale of the Foster Loan to AHI was consummated on Friday, March 14 for $1,271,000.00. On March 17, TBON notified Mr. Surti that the Foster Loan had been sold. On the same day AHI notified Mr. Surti that it was initiating foreclosure proceedings; a foreclosure sale was scheduled for May 23. Mr. Surti submitted an affidavit stating that he attempted to contact AHI on several occasions in order to "settle the account," but that he received no response. At some point in April or May 2003, during the course of discussing another business matter Mr. Lowe asked Mr. Winfree if he knew what had happened with Mr. Surti's Foster Property. Mr. Winfree told him that the Note had been purchased by AHI, but that he did not know the status. Mr. Lowe asked Mr. Winfree to look into the matter because J&B Investments was still interested in acquiring the property. After looking into it, Mr. Winfree called Mr. Lowe back and told him that the Foster Property was being foreclosed on and provided Mr. Lowe with the contact information of the attorney handling the foreclosure, Mr. Mangrum. Mr. Lowe began communicating with Mr. Mangrum, an attorney representing AHI in the foreclosure proceeding, about the date the Foster Property was set for auction. On May 23, 2003, the date of the foreclosure sale, Foster filed a Chapter 11 bankruptcy petition, which stayed the foreclosure. Mr. Lowe learned from Mr. Mangrum that Foster had filed for bankruptcy.

On July 15, 2003, Mr. Lowe's company, now J&B Investments, arranged to buy the Foster Loan from AHI for $1.4 million. The purchase was financed by First State, which had previously approved Mr. Lowe's application for financing for the purpose of acquiring the Foster Property in late February/early March, with Mr. Winfree signing the financing documents for First State. Pursuant to the Foster Chapter 11 bankruptcy plan, Foster paid $1.5 million to J&B Investments "in full satisfaction of the loan obligation."

## II. Analysis

## A. Rule 12 Dismissal

The Plaintiffs contend on appeal that "the trial court erred in finding that Mr. Winfree owed no fiduciary duty to the Appellants because of Tenn. Code Ann. § 45-1-127."[12] The Appellants argue that because "fiduciary duty may be of any kind of relationship which implies confidence, as

_____

[12] Plaintiffs do not challenge the trial court's Tenn. R. Civ. P. 12.02(6) dismissal of the breach of fiduciary duty and violations of T.C.P.A. claims against AHI.

. . . confidential friend and advisor, indeed any relationship of confidence between persons which gives one dominion or influence over the other," *Roberts v. Chase*, 166 S.W.2d 641, 650 (Tenn. Ct. App. 1942), and because "Mr. Winfree was a long time friend and advisor who possessed, by virtue of his position, confidential financial and business information regarding Mr. Surti and his business" and that Mr. Winfree was "bound by statutory duties and internal policies to keep that information confidential and to not engage in conduct which is in conflict with the Appellants' interests."

The purpose of a Tenn. R. Civ. P. 12.02(6) motion to dismiss is to determine whether the pleadings state a claim upon which relief can be granted. A Rule 12 motion only challenges the legal sufficiency of the complaint. It does not challenge the strength of the plaintiff's proof. *See Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 554 (Tenn. 1999). In reviewing a motion to dismiss, we must liberally construe the complaint, presuming all factual allegations to be true and giving the plaintiff the benefit of all reasonable inferences. *See Pursell v. First American National Bank*, 937 S.W.2d 838, 840 (Tenn. 1996); *see also Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 696-97 (Tenn. 2002). Thus, a complaint should not be dismissed for failure to state a claim unless it appears that the plaintiff can prove no set of facts in support of his or her claim that would warrant relief. *See Doe v. Sundquist*, 2 S.W.3d 919, 922 (Tenn. 1999); *Fuerst v. Methodist Hospital South*, 566 S.W.2d 847, 848 (Tenn. 1978). Making such a determination is a question of law. Our review of a trial court's determinations on issues of law is *de novo*, with no presumption of correctness. *Frye v. Blue Ridge Neuroscience Center, P.C.*, 70 S.W.3d 710, 713 (Tenn. 2002); *Bowden v. Ward*, 27 S.W.3d 913, 916 (Tenn. 2000).

The Complaint here alleged that Mr. Winfree "breached a fiduciary duty owed to Mr. Surti, individually and as a representative of Foster Business Park, LLC. [Mr. Winfree] utilized confidential financial information conveyed to [him] by Mr. Surti in confidence for [his] own financial gain to the detriment of Plaintiffs." The trial court granted Mr. Winfree's Tenn. R. Civ. P. 12.02(6) Motion for Partial Dismissal, but only with respect to Mr. Winfree's "actions he carried out by or on behalf of a financial institution and/or in the scope and course of his duties as an officer or employee of a financial institution, including the [sic] Bank of Nashville and/or First State Bank" on the basis of Tenn. Code Ann. § 45-1-127. In explaining its ruling, the trial court reasoned that only a partial dismissal was appropriate at that stage of the case because "Plaintiffs have alleged sufficient facts to state a claim for breach of fiduciary duty for actions carried out by Mr. Winfree unrelated to his employment by a financial institution."

Tenn. Code Ann. § 45-1-127 provides that financial institutions and their officers cannot be "deemed or implied to be acting as fiduciary or have a fiduciary obligation or responsibility to its customers or to other parties . . . unless there is a written agreement" to act in that capacity. Given that there was no allegation of a written agreement between Mr. Winfree and the Plaintiffs to act as a fiduciary, we find that the trial court properly dismissed the breach of fiduciary duty claim to the extent that the claim was based on Mr. Winfree's actions as an officer or employee or on behalf of a financial institution; consequently, we affirm the Rule 12.02(6) dismissal of this claim.

## B. Summary Judgment

The Plaintiffs contend that the trial court erred in granting summary judgment to the Defendants because there were genuine issues of material fact. In their brief to this Court, however, the Plaintiffs failed to reference which parts of the record support their arguments and with regard to two of their issues – whether the trial court erred in dismissing the Plaintiffs' claims for intentional interference with a business relationship and violation of the TCPA – the Plaintiffs fail to cite any authority supporting their conclusory argument that there are disputed facts without saying which facts are in dispute. The Plaintiffs merely assert that "[t]he Affidavit of Mr. Surti clearly establishes facts that give rise to disputed material facts that must be resolved" without saying which facts set forth by the Defendants that the Affidavit actually disputes.[13]

As the appellant, the Plaintiffs had the burden to make citations in their brief to appropriate authorities and reference the record to support their argument on appeal. Tenn. R. App. P. 27(a);[14] *State v. Weaver*, No. M2001-00873-CCA-R3-CD, 2003 WL 1877107, *16 (Tenn. Crim. App. Apr. 15, 2003) (citing Tenn. R. App. 27(a)(4), (7)); *see also Vineyard v. Betty*, No. M2001-00642-COA-R3-CV, 2002 WL 772870, *3 (Tenn. Ct. App. Apr. 30, 2002); *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983); *McDonald v. Onoh*, 772 S.W.2d 913, 914 (Tenn. Ct. App. 1989). While Plaintiffs' statement of the facts section provides some references to the record, the Plaintiffs' argument is wholly deficient of references to the record to support their assertions that there are genuine issues of material fact. Moreover, the Plaintiffs' argument contains little more than conclusory allegations, which are only supported by argument of their counsel, neither of which constitute evidence we can consider. *See Vineyard*, 2002 WL 772870, *3 (citing *State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988)).

In the case of *Lykins v. Key Bank USA, N.A.*, No. E2005-01572-COA-R3-CV, 2006 WL 2482963, *4-5 (Tenn. Ct. App. Aug. 29, 2006), we were presented with an appellant's brief that contained no citation to the record. After discussing the appellant's failure to comply with the Tenn. R. App. P. 27(a)(6), we discussed Rule 6(b) of the Rules of the Court of Appeals which provides that

> [n]o complaint of or reliance upon action by the trial court will be considered on appeal unless the argument contains a specific reference to the page or pages of the record where such action is recorded. *No assertion of fact will be considered on*

---

[13] The Affidavit of Mr. Surti, which the Plaintiffs reference, was submitted to the trial court in response to the Defendants' Motion for Summary Judgment.

[14] Tenn. R. App. P. 27(a)(7) provides in relevant part:

(7) An argument, which may be preceded by a summary of argument, setting forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record (which may be quoted verbatim) relied on....

*appeal unless the argument contains a reference to the page or pages of the record where evidence of such fact is recorded.*

*Lykins*, 2006 WL 2482963, *4-5 (Tenn. Ct. App. Aug. 29, 2006) (quoting Tenn. R. Ct. App. 6(b)) (emphasis added).

A similar situation arose in *Bean v. Bean*, 40 S.W.3d 52 (Tenn. Ct. App. 2000), where the brief failed to comply with Tenn. R. App. P. 27 and Rule 6 of the Rules of the Court of Appeals. In *Bean*, the deficiencies resulted in a dismissal of the appeal. There, we held:

> Courts have routinely held that the failure to make appropriate references to the record and to cite relevant authority in the argument section of the brief as required by Rule 27(a)(7) constitutes a waiver of the issue. . . . Because of the numerous deficiencies in Appellant's brief, we decline to address the issues raised. As noted in *England v. Burns Stone Co., Inc.*, 874 S.W.2d 32, 35 (Tenn. Ct. App. 1993), parties cannot expect this court to do its work for them. This Court is under no duty to verify unsupported allegations in a party's brief, or for that matter consider issues raised but not argued in the brief.

*Bean*, 40 S.W.3d at 55-56 (citations omitted).

Rule 1 of the Rules of the Court of Appeals permits this Court to review a party's issues on appeal despite apparent citation deficiencies in order to expedite a decision upon the matter.[15] While, as stated in *Bean*, we are under no duty to verify unsupported allegations in the Plaintiffs' brief or to consider an issue raised but not properly argued in their brief, *Bean*, 40 S.W.3d at 55-56 (citing *Duchow v. Whalen*, 872 S.W.2d 692, 693 (Tenn. Ct. App. 1993); *Airline Constr., Inc. v. Barr*, 807 S.W.2d 247 (Tenn. Ct. App. 1990)), we will nevertheless review the issues presented on appeal in an effort to move this case toward resolution.

Tenn. R. Civ. P. 56.03 provides that summary judgment is only appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn.1993); and (2) the moving party is entitled to a judgment as a matter of law on the undisputed facts. *Anderson v. Standard Register Co.*, 857 S.W.2d 555, 559 (Tenn.1993); Tenn. R. Civ. P. 56.03. The moving party has the ultimate burden of persuading the court that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Byrd*, 847 S.W.2d at 215. Courts must view the evidence in the light most favorable to the nonmoving party and must also draw all

---

[15] Rule 1 of the Rules of the Court of Appeals of Tennessee permits "for good cause, including the interest of expediting a decision upon any matter, this Court . . . [to] suspend the requirements or provisions of any of these rules in a particular case on motion of a party, or on its own motion, and may order proceedings in accordance with its discretion."

reasonable inferences in the nonmoving party's favor. *Byrd*, 847 S.W.2d at 210-11. Courts should grant a summary judgment only when both the facts and the conclusions to be drawn from the facts permit a reasonable person to reach only one conclusion. *Id.*; *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995).

The Tennessee Supreme Court recently clarified the analysis for determining whether the moving party has met its burden of proof on a motion for summary judgment. *See Martin v. Norfolk Southern Railway Co.*, No. E2006-01021-SC-R11-CV, 2008 WL 4890252, ___ S.W.3d ___ (Tenn. Nov. 14, 2008); *Hannan v. Alltel Publ'g Co.*, No. E2006-01353-SC-R11-CV, 2008 WL 4755788, ___ S.W.3d ___ (Tenn. Oct. 31, 2008). The *Martin* court explained the analysis as follows:

> The moving party may make the required showing and therefore shift the burden the burden of production to the nonmoving party by either: (1) affirmatively negating an essential element of the nonmoving party's claim; or (2) showing that the nonmoving party cannot prove an essential element of the claim at trial. *Hannan v. Alltel Publ'g Co.*, ___ S.W.3d ___, ___ (Tenn. 2008); *see also McCarley*, 960 S.W.2d [585,] 588 [(Tenn. 1998)]. Both methods require something more than an assertion that the nonmoving party has no evidence. *Byrd*, 847 S.W.2d at 215. Similarly, the presentation of evidence that raises doubts about the nonmoving party's ability to prove his or her claim is also insufficient. *McCarley*, 960 S.W.2d at 588. The moving party must either produce evidence or refer to evidence submitted by the nonmoving party that negates an essential element of the nonmoving party's claim or shows that the nonmoving party cannot prove an essential element of the claim at trial. *Hannan*, ___ S.W.3d at ___. We have held that to negate an essential element of the claim, the moving party must point to evidence that tends to disprove an essential factual claim made by the nonmoving party. *See Blair v. W. Town Mall*, 130 S.W.3d 761, 768 (Tenn. 2004).

*Martin,* ___ S.W.3d at ___.

The *Martin* court further explained:

> If the moving party makes a properly supported motion, then the nonmoving party is required to produce evidence of specific facts establishing that genuine issues of material fact exist. *McCarley*, 960 S.W.2d at 488; *Byrd*, 847 S.W.2d at 215. The nonmoving party may satisfy its burden of production by:
>
> > (1) pointing to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitating the evidence attacked by the moving party; (3) producing additional evidence establishing the existence of a genuine issue for trial; or (4) submitting an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule 56.06.

-13-

*McCarley*, 960 S.W.2d at 588; *accord Byrd*, 847 S.W.2d at 215 n.6. The nonmoving party's evidence must be accepted as true, and any doubts concerning the existence of a genuine issue of material fact shall be resolved in favor of the nonmoving party. *McCarley*, 960 S.W.2d at 588.

*Martin,___* S.W.3d at ___.

When reviewing the evidence on motion for summary judgment, a court must first determine whether a factual dispute exists; if a factual dispute exists, the court must then ascertain whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial." *Eskin v. Bartree*, 262 S.W.3d 727, 732 (Tenn. 2008); *McCarley*, 960 S.W.2d at 588. "A disputed fact is material if it must be decided in order to resolve the substantive claim or defense at which the motion is directed." *Martin*,___ S.W.3d at ___ (*quoting Byr*d, 847 S.W.2d at 215). A disputed fact presents a genuine issue if "a reasonable jury could legitimately resolve that fact in favor of one side or the other." *Id.*

*1. Breach of Fiduciary Duty Claim*

The Complaint alleged that Mr. Winfree "breached a fiduciary duty owed to Mr. Surti, individually and as a representative of Foster Business Park, LLC. [Mr. Winfree] utilized confidential financial information conveyed to [him] by Mr. Surti in confidence for [his] own financial gain to the detriment of Plaintiffs" and that Mr. Lowe and J&B Investments conspired with Mr. Winfree to breach the fiduciary duty. The Complaint alleged that Mr. Surti and Mr. Winfree "had a history . . . which spanned over twelve years," and had started when Mr. Surti sought Mr. Winfree's advice in starting a new business prior to Mr. Winfree's employment with TBON. The Complaint further alleged that Mr. Surti continued to seek Mr. Winfree's "advice and aid" after Mr. Winfree began his employment with TBON and that while at TBON Mr. Winfree acquired knowledge regarding the Foster Business Park Loan, which he utilized "for financial gain" after he transferred to First State Bank.

Under Tennessee common law, there are two principal types of fiduciary status.[16] The first category of common law fiduciary status consists of relationships that are fiduciary *per se*, sometimes referred to as legal fiduciary, such as between a guardian and ward, an attorney and client, or conservator and incompetent. *See Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Mitchell v. Smith*, 779 S.W.2d 384, 389 (Tenn. Ct. App. 1989); *Parham v. Walker*, 568 S.W.2d 622, 625 (Tenn. Ct. App. 1978). The second category consists of relationships that are not *per se* fiduciary in nature, but arise in situations where one party exercised "dominion and control over another." *Kelley v.*

---

[16] All fiduciary relationships are confidential relationships, but not all confidential relationships are fiduciary relationships. A fiduciary relationship connotes a legal relationship, a confidential relationship includes not only fiduciary relationships but also every other relationship in which confidence is rightly reposed and exercised. Steven W. Feldman, *Tennessee Practice: Contract Law and Practice* § 6.13, at 504 (2006) ("*Tennessee Practice: Contract Law and Practice*").

*Johns*, 96 S.W.3d 189, 197 (Tenn. Ct. App. 2002); *Matlock v. Simpson*, 902 S.W.2d 384, 385-86 (Tenn. 1995); *Kelly v. Allen*, 558 S.W.2d at 848. This relationship, often called a "confidential relationship," "is not merely a relationship of mutual trust and confidence, but rather it is one 'where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party.'" *Kelley v. Johns*, 96 S.W.3d at 197 (*citing Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973)). The person upon whom the trust and confidence is imposed is under a duty to act for and to give advice for the benefit of the other person on matters within the scope of the relationship. *McRedmond v. Estate of Marianelli*, 46 S.W.3d 730, 738 (Tenn. Ct. App. 2000); *Restatement (Second) of Torts* § 874 cmt. a (1979).

Relationships that are not fiduciary *per se* "require proof of the elements of dominion and control in order to establish the existence of a confidential relationship." *Kelley v. Johns*, 96 S.W.3d at 197 (*citing Matlock v. Simpson*, 902 S.W.2d at 385-86; *Kelly v. Allen*, 558 S.W.2d at 848. Moreover, a confidential relationship cannot be unilateral, rather both parties must understand that a special trust or confidence has been reposed. *See Craggett v. Adell Ins. Agency*, 635 N.E.2d 1326, 1331-32 (Ohio Ct. App. 1993); *Westlake Vinyls, Inc. v. Goodrich Corp.*, 518 F.Supp.2d 902, 917-18 (W. D. Ky. 2007); *Quinn v. Phipps*, 113 So. 419, 421 (Fla. 1927); *Steele v. Victory Sav. Bank*, 368 S.E.2d 91, 94 (S.C. Ct. App. 1988).

The relationship between a lender and his customer, as in the present case, falls within the latter category. "Although fiduciary relationships may arise whenever confidence is reposed by one party in another who exercises dominion and influence, the dealings between a lender and borrower are not inherently fiduciary absent special facts and circumstances." *Oak Ridge Precision Industries, Inc. v. First Tennessee Bank Nat. Ass'n*, 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992) (no fiduciary relationship where plaintiff/debtor represented itself as an entity that had become too large and sophisticated to rely on small banks, such as the defendant, for its needs and described its relationship with the defendant/lender as one in deterioration). Because confidential relationships can assume a variety of forms, the courts have been hesitant to define precisely what a confidential relationship is and the court must look to the particular facts and circumstances of the case to determine whether one party exercised dominion and control over another, weaker party. *See e.g., Roberts v. Roberts*, 827 S.W.2d 788 (Tenn. Ct. App. 1991) (the fact that the defendant, deceased's brother, transported deceased on local trips and on one occasion arranged the renewal of a certificate of deposit for deceased is not sufficient to establish a confidential relationship); *Kelley v. Johns*, 96 S.W.3d at 197 (evidence that two persons are members of the same family, without more is insufficient to prove confidential relationship); *see also Warren v. Percy Wilson Mtge. & Fin. Corp.*, 472 N.E.2d 364 (Ohio 1984) (no fiduciary status arising from advice given in routine business relationship between debtor and creditor)*; Umbaugh Pole Bldg. Co. v. Scott*, 390 N.E.2d 320 (Ohio 1979) (creditor's provision of advice and counseling to debtor in a congenial atmosphere not enough to create a confidential or fiduciary relationship); *Blon v. Bank One*, 519 N.E.2d 363 (Ohio 1988) (no fiduciary status conferred in arm's-length business transaction).

i. Mark Winfree

In light of the trial court's dismissal of the *per se* fiduciary duty claim, which we have affirmed, any claim of breach of fiduciary duty must be based on a confidential relationship, which is proven by demonstrating that confidence was placed by one in the other and the recipient of that confidence was able to influence and exercise dominion and control over the weaker or dominated party. *See Kelley v. Johns*, 96 S.W.3d at 197. In order to prevail on his Motion for Summary Judgment, therefore, Mr. Winfree was required to produce evidence or refer to evidence previously submitted by the Plaintiffs that establishes that there was no confidential relationship between Mr. Surti and himself. *See Hannan*, No. E2006-01353-SC-R11-CV, 2008 WL 4755788 at * ___, ___ S.W.3d at ___ ("The moving party must either produce evidence or refer to evidence submitted by the nonmoving party that negates an essential element of the nonmoving party's claim or shows that the nonmoving party cannot prove an essential element of the claim at trial"). The existence of a confidential relationship requires proof that Mr. Winfree, by virtue of the trust and confidence Mr. Surti placed in him, exercised dominion and control over Mr. Surti or his companies.

In his Statement of Undisputed Facts in Support of Their [sic] Motion for Summary Judgment, Mr. Winfree points to statements Mr. Surti made in his deposition in which he admits Mr. Winfree never exercised dominion or control over him or his companies in making personal or business decisions. In Mr. Surti's deposition, the following exchange took place between Mr. Winfree's attorney and Mr. Surti:

Q. Would you say that [Mr. Winfree] controlled your life?
A. No.
Q. Would you say that he dominated your family?
A. No.
Q. Did he dominate your, your business life?
A. No.
Q. Is it fair to say that, you, you've told me earlier that you ran Foster Business Park.
A. Correct.
Q. You also ran Arte'; did you not?
A. Correct.
Q. You were the Chief Executive Officer, if there was such a thing, you were the Chief Executive Officer?
A. Right.
Q. And Mark Winfree did not exe–, exert dominion or control over any of those companies or over your family life; isn't that true?
A. Right.

The above exchange took place following an explanation by Mr. Surti about the close personal and business relationship he had with Mr. Winfree in which Mr. Surti stated "we had lots of discussions where I would take his advice and his advice was very important to me." Mr. Winfree also points to statements made by Mr. Surti in his deposition that he understood that when he met

Mr. Winfree, Mr. Winfree was employed by the State of Tennessee in the Tennessee State Development Office and that when Mr. Winfree began working for TBON, and subsequently First State, Mr. Winfree was representing those banks' interests, not Mr. Surti's or his companies. The following exchange between Mr. Winfree's attorney and Mr. Surti took place:

> Q. When [Mr. Winfree] was an employee of The Bank of Nashville, did you understand that he was working for The Bank of Nashville?
> A. Yes Sir.
> Q. And that he represented The Bank of Nashville?
> A. Yes.
> Q. And you understood, didn't you, that his interest and The Bank of Nashville's interest were not always the same as your interests?
> A. Ask that question one more time, please.
> Q. Okay. Did you give The Bank of Nashville a Deed of Trust on Foster Business Park?
> A. Yes.
> Q. And what was the point of that, giving them the Deed of Trust? It was so if you didn't pay the loan, they could foreclose on the property; wasn't it?
> A. That's, yeah, it's a collateral.
> Q. Right. And so, you understood that, at least in that instance, Mr. Winfree is representing the bank, and his interest and your interest, the bank's interest and Foster's business are not the same, are they?
> A. Right.
> Q. Because if the, if you don't pay the bank, they're going to take the property?
> A. Correct.
> Q. And you understood that?
> A. Yeah.
> Q. And you understood that was [Mr. Winfree's] role?
> A. Right.
> Q. Right. You may have regarded him as a friend, but his role is to represent The Bank of Nashville; wasn't it?
> A. Uh-huh. [Affirmative.]
> . . .
> Q. You understood that, when he moved to First State Bank, he was representing First State Bank?
> A. Correct.

We find these facts were sufficient to shift the burden of production to the Plaintiffs, the nonmoving party. The Plaintiffs were required to point to evidence establishing material factual disputes that were either over-looked or ignored by Mr. Winfree; rehabilitate the evidence attacked by Mr. Winfree; produce additional evidence establishing the existence of a genuine issue for trial; or submit an affidavit explaining the necessity for further discovery. *See Martin,* No. E2006-01021-SC-R11-CV, 2008 WL 4890252 at * ___, ___ S.W.3d at ___ *(citing McCarley*, 960 S.W.2d at 588;

*accord Byrd*, 847 S.W.2d at 215 n.6). Mr. Surti was unable to rehabilitate the evidence cited by Mr. Winfree to negate the element of "dominion and control." In fact, Plaintiffs' Response to the Statement of Undisputed Facts shows that Mr. Surti admitted this fact:

> 2. By Mr. Surti's own admission, Mr. Winfree never exercised dominion or control over Mr. Surti or his companies. (Surti depo., p.44, 1.3-9, 18-21). Mr. Surti understood that when Mr. Winfree went to work for The Bank of Nashville (ATBON@) [sic], he was representing the Bank's interest, not Mr. Surti's or his companies. (Mr. Surti depo., p.45, 1.44 - p.47, 1.9).

> **RESPONSE: Admitted for the purposes of ruling on this motion only.**

The Plaintiffs, in an effort to point to over-looked or ignored evidence, disputed the statement that "Mr. Winfree had no non-business relationship with Mr. Surti. The two did not go to functions or events together. (Winfree depo., p.23, 1.7-12)" by stating in their Response to the Statement of Undisputed Facts that "Mr. Winfree was a close friend and advisor who had been to the Surti's home on several occasions and who regularly lunched with Mr. Surti. (Exhibit 18, Surti Dep.) [sic]." This fact, assuming its truth, without more does not establish the existence of a confidential relationship. The Plaintiffs also failed to produce additional evidence establishing the existence of a genuine issue for trial or the need to seek further discovery.

We agree with the trial court's finding that "it is undisputed Defendant Winfree acted at all times relevant to this case, from 1997 to and through 2003, as an officer of either [TBON] or of First State Bank in his dealings with the plaintiffs." We also agree with the trial court's conclusion that "as provided in T.C.A. [sic] § 45-1-127, Mr. Winfree was not a fiduciary with respect to any of the plaintiffs." Finally, we conclude that there is nothing in the record to show that Mr. Winfree had, at any time relevant to this case, a confidential relationship with Mr. Surti in which he exercised any dominion or control over Mr. Surti or any of his companies. Mr. Surti was an experienced businessman who owned multi-million dollar commercial real estate and had managed several companies over more than twenty years and clearly understood the nature of his relationship with Mr. Winfree as his lender, *i.e.,* that Mr. Winfree, when employed by TBON and First State, represented his employer's interests and not those of Mr. Surti or any of his companies. Moreover, Mr. Surti confirmed in his deposition that neither he nor his companies were ever under the dominion or control of Mr. Winfree. Mr. Surti never rehabilitated his deposition statements nor produced new evidence showing that Mr. Winfree had either a legal or *per se* fiduciary relationship or that Mr. Surti placed confidence in Mr. Winfree who was then able to influence and exercise dominion and control over Mr. Surti or his companies. Since Mr. Winfree was able to negate an essential element of the breach of fiduciary duty claim – that Mr. Winfree owed no duty to Mr. Surti because there was neither a legal, or *per se,* fiduciary relationship nor was there a confidential relationship – we affirm the trial court's summary judgment dismissing the breach of fiduciary duty claim against Mr. Winfree.

ii. Billy Lowe and J&B Investments, Inc.

The Plaintiffs allege that Mr. Lowe and J&B Investments conspired with Mr. Winfree causing him to disclose Foster's and Mr. Surti's confidential information to them in order to first facilitate their attempts to purchase the Foster Property and later their acquisition of the Foster Note and collateral package. The Plaintiffs allege that Mr. Winfree must have told Mr. Lowe confidential information about Foster and Mr. Surti including the principal amount owed on the Foster Loan, which Mr. Winfree obtained from TBON, because otherwise Mr. Lowe's offer to purchase the Foster Property for $1.4 million was too coincidental.

"An actionable civil conspiracy is a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means, which results in damage to the plaintiff." *Trau-Med of America, Inc.*, 71 S.W.3d at 703; *see Brown v. Birman Managed Care, Inc.,* 42 S.W.3d 62, 67 (Tenn. 2001) (*citing Dale v. Thomas H. Temple Co.,* 208 S.W.2d 344, 353 (Tenn. 1948)). The elements for civil conspiracy under Tennessee common law, therefore, are: (1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) injury to person or property resulting in attendant damage. *Braswell v. Carothers*, 863 S.W.2d 722, 727 (Tenn. Ct. App. 1993). In addition, civil conspiracy requires an underlying predicate tort allegedly committed pursuant to the conspiracy. *Morgan v. Brush Wellman, Inc.*, 165 F.Supp.2d 704, 721 (E.D. Tenn. 2001) (*citing Tenn. Publ'g Co. v. Fitzhugh*, 52 S.W.2d 157, 158 (Tenn. 1932)).

Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. *Freeman Mgmt. Corp. v. Shurgard Storage Centers, LLC*., 461 F.Supp.2d 629, 642-643 (M.D. Tenn. 2006). By participating in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other coconspirators within the ambit of the conspiracy. In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors. *Id.*; *see also Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal. 1994); *Accord. Beck v. Prupis*, 529 U.S. 494, 503 (2000) (noting it was "sometimes said that a conspiracy claim was not an independent cause of action, but was only the mechanism for subjecting co-conspirators to liability when one of their members committed a tortious act").

The trial court found that the Dismissal Order which granted summary judgment to Mr. Winfree and AHI warranted an award of judgment as to Mr. Lowe and J&B Investments as a matter of law. Because we have affirmed the trial court's judgment that Mr. Winfree had no fiduciary duty to any of the Plaintiffs, we find that summary judgment was also proper as to the alleged civil conspiracy to breach a fiduciary duty claim against Mr. Lowe and J&B Investments.

*2. Intentional Interference with a Business Relationship*

The Complaint alleged that Defendants Winfree and AHI intentionally interfered with Foster's business relationship with TBON and that Defendants Lowe and J&B Investments conspired to commit the tort of intentional interference with that relationship. The Plaintiffs contend that Mr. Winfree interfered with Mr. Surti's negotiations with TBON to enter into a Forbearance and Release Agreement that would have allowed Foster to pay off the Foster Loan for $1 million, a reduction from the principal and interest owed of almost $500,000. According to the Plaintiffs, the period between December 2002 and March 14, 2003, was a critical period during which Mr. Winfree and AHI behaved in a wrongful manner and caused TBON to abandon the Second Forbearance Agreement negotiations and that Mr. Winfree and AHI's alleged wrongful conduct was connected to TBON's decision to sell the Foster Loan at a discount to AHI rather than settle the default with Foster. The Plaintiffs assert that Mr. Winfree's goal was to enable Mr. Lowe to buy the Foster Property even though Mr. Surti did not want to sell to Mr. Lowe. Mr. Winfree's motive, according to Mr. Surti, was that AHI or First State would buy the secured note for $1.2 million and resell the note to Mr. Lowe for $1.4 million. First State would then provide the purchase funds to Mr. Lowe, Mr. Winfree and First State would have a good loan on the bank's books and, ultimately, First State and Mr. Winfree would benefit.

The tort of intentional interference with a business relationship was expressly recognized in Tennessee in *Trau-Med of America, Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691 (Tenn. 2002). The court stated that "liability should be imposed on the interfering party provided that the plaintiff can demonstrate the following:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons;
> (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general;
> (3) the defendant's intent to cause the breach or termination of the business relationship;
> (4) the defendant's improper motive or improper means; and
> (5) damages resulting from the tortious interference."

*Trau-Med of America, Inc.* , 71 S.W.3d at 701 (internal citations removed).

The relations protected against intentional interference include "any prospective contractual relations, except those leading to contracts to marry, if the potential contract would be of pecuniary value to the plaintiff." *Id.* at note 4 (*citing Restatement (Second) of Torts § 766B comment c*). Whether a defendant acted "improperly" or possessed an "improper" motive is "dependent on the particular facts and circumstances of a given case," and as a result there is no precise, all-encompassing definition of the term "improper;" however, the *Trau-Med* court provided some guidance. Examples of "improper means" include "those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules; violence,

-20-

threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship; and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition." *Id.* To prove "improper motive," the plaintiff must "demonstrate that the defendant's predominant purpose was to injure the plaintiff." *Id.* at note 5; *see Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 307-308 (Utah 1982).

i.  Mark Winfree and AHI

As the moving party on summary judgment, Mr. Winfree and AHI had the burden of affirmatively negating an essential element of the nonmoving party's claim or showing that the nonmoving party cannot prove an essential element of the claim at trial. *Martin*, supra. Mr. Winfree and AHI negated an essential element of the Plaintiffs' claim by showing that their actions did not cause the Plaintiffs' damages.

It is undisputed that Foster and Mr. Surti had an ongoing business relationship with TBON since at least 1997 when TBON issued the Foster Loan and that Mr. Winfree knew of this relationship as he had been Mr. Surti's loan officer while employed by TBON. It is also undisputed that Mr. Winfree knew that the Foster Loan was in default because Mr. Surti told him about it when seeking Mr. Winfree's and First State's help in refinancing the loan. Mr. Winfree and AHI contend that the Plaintiffs cannot prevail under the tortious interference theory because it was Foster's default on the Foster Loan and Mr. Surti's failure to agree to the Second Forbearance Agreement that caused the Plaintiffs' damages not Mr. Winfree or AHI.

The Defendants showed that Foster defaulted on its loan obligations when it stopped making payments in September 2002 and failed to cure the default thereafter. Because the Foster Loan was in default and classified as a criticized asset, TBON was preparing to foreclose on the Foster Property and Ms. Hackett testified in her deposition that she was working simultaneously on various fronts "to get this credit resolved." One of the ways in which Ms. Hackett was working to resolve the credit issue with Foster was by negotiating a Forbearance and Release Agreement with Mr. Surti. The Defendants showed through Ms. Hackett's deposition testimony and TBON records that the Second Forbearance Agreement negotiations between Mr. Surti on behalf of Foster and Ms. Hackett at TBON were at an impasse as of March 6, 2003. Foster's attorney, Joe Rusnak, sent an email to TBON attorney, Charles Reasor, III, stating that Mr. Surti could not agree to certain language in the Second Forbearance Agreement. Ms. Hackett testified in her deposition that TBON could never agree to Mr. Surti's proposed language. The following exchange took place between the Defendant's counsel and Ms. Hackett:

Q.  That appears to me to be an e-mail from Mr. Rusnak to Mr. Reasor. Mr. Rusnak says, ["]please advise Mr. Reasor that the proposed revised language at Paragraph 9 is not acceptable. We respectfully insist on the language of my previous draft.["]

And then, he puts a paragraph in there that he, apparently, wants included in paragraph 9 of the [Second] Forbearance Agreement.
A. Uh-huh. [Affirmative.]
Q. Do you recall negotiations, regarding this language, what has to do with, which has to do with how the bank is going to report this transaction to the credit agencies?
A. There was an issue with regards to that, yes. As, as far as they had asked us to, basically, say it was settled in full.
Q. Okay. And not charged off to bad debt, it says there in the –
A. Yes.
Q. And was the bank willing to do that?
A. No.
Q. Was the bank ever going to be willing to do that?
A. No.
Q. Why not?
A. Because that's not what was taking place.
Q. You were going to have to charge off some of this to bad debt?
A. Yes.
Q. So, the bank, I take it, was not willing to make false statement to credit reporting agencies?
A. That's correct.

The Defendants also showed that Ms. Hackett's decision to cease negotiations with Foster and Mr. Surti on the Second Forbearance Agreement was not influenced by any of the Defendants. Ms. Hackett testified in her deposition that she communicated to Mr. Surti verbally, and possibly through email, that he had to make a $200,000 deposit by March 7 and that "if that $200,000 deposit didn't come in and we didn't get the documents signed then we were going to continue to move forward with foreclosure proceedings or what other means of collecting on this debt that we had." Ms. Hackett emailed the wire transfer instructions to Mr. Surti on March 5, 2003, so that he could make the $200,000 deposit by March 7. Ms. Hackett also testified that when Mr. Surti failed to make the $200,000 deposit or sign the Second Forbearance Agreement on the evening of March 7, she told TBON attorney, Mr. Reasor, to notify Foster's attorney that TBON would "go ahead and move forward . . . in whatever action we can take to collect the debt." On Monday March 10, Mr. Reasor faxed Foster's attorney, Mr. Rusnak, a letter that stated "as a result of [Foster's] and [Mr. Surti's] failure to execute and perform under the [Second Forbearance Agreement] proposed by [TBON], [TBON] is no longer willing to discuss forbearance with [Foster and Mr. Surti] and has begun the process of enforcing fully its rights under all documents evidencing and securing the Loan including, but not limited to, invoking the power of sale under the Deed of Trust."[17]

---

[17] The Plaintiffs contend that the "power of sale" language in Mr. Reasor's letter indicates that on March 10, 2003, TBON already had a deal with the Defendants to sell the Foster Loan to AHI. The "power of sale under the Deed of Trust" language, however, merely means that TBON was invoking it's legal authority to initiate foreclosure proceedings.

Ms. Hackett was asked in her deposition whether Mr. Winfree or Mr. Lowe had anything to do with her decision to cease the Second Forbearance Agreement negotiations with Mr. Surti and she responded, "no." Her statement is corroborated by the February 28, 2003, Criticized Asset Report written by Ms. Hackett in early March 2003, which stated:

> [a]s Mr. Surti failed to sign the Forbearance Agreement and failed to make the $200M deposit, TBON is proceeding with foreclosure and has tentatively scheduled a foreclosure sale date of April 10[th]. No further negotiations will continue on this account as TBON has twice attempted to enter a Forbearance Agreement with Mr. Surti without success.

The Defendants also showed through Ms. Hackett's deposition testimony that Mr. Surti never made an attempt to restart the forbearance negotiations by explaining why he had not signed the Second Forbearance Agreement or delivered the deposit nor did he ever offer to sign the Second Forbearance Agreement or pay the $200,000 deposit. Ms. Hackett's deposition revealed the following:

Q. Did they ever come to you and say, we need more time?
A. No.
Q. What happened after, so, did you have any reaction at all from Mr. Rusnak or Mr. Surti to the letter that was sent by Mr. Reasor to Mr. Rusnak on March the 10th, informing him that negotiations are done?
A. No response.

Finally, the Defendants showed that neither Mr. Winfree, AHI nor Mr. Lowe received confidential information from TBON or any other source that would have allowed them to intervene in Mr. Surti's Second Forbearance Agreement negotiations with TBON. Mr. Winfree testified in his deposition that he did not know that TBON was negotiating a forbearance agreement with Mr. Surti. Mr. Surti testified in his deposition that he told Mr. Winfree about the forbearance negotiations with TBON, but later in his deposition testimony he recanted that statement and said that he did not tell Mr. Winfree about the negotiations, but that "someone must have." Bruce Lattimer attested that Mr. Surti did not tell him that he was negotiating a forbearance agreement with TBON; Mr. Lattimer also attested that he did not share any of the financial information given him by Mr. Surti with Mr. Winfree. Ms. Hackett testified in her deposition that she never provided Mr. Winfree with any confidential customer information about Foster or Mr. Surti and never told Mr. Winfree about TBON's forbearance negotiations with Mr. Surti. Ms. Hackett also testified in her deposition that she never communicated with Mr. Lowe. Mr. Winfree testified in his deposition that he did not receive any confidential information about Foster or Mr. Surti from TBON or Mr. Lowe nor did he give the limited information he had (i.e., the Foster Loan pay off amount he received from TBON) to Mr. Lowe.

We believe that the above evidence produced by the Defendants negated the essential elements of improper means or motive and causation and, thus, was sufficient to shift the burden of production to the Plaintiffs to (1) point to evidence establishing material factual disputes that were

over-looked or ignored by the moving party; (2) rehabilitate the evidence attacked by the moving party; (3) produce additional evidence establishing the existence of a genuine issue for trial; or (4) submit an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule 56.06. *See McCarley*, 960 S.W.2d at 588. In Response to the Defendants Motion for Summary Judgment, the Plaintiffs pointed to evidence that they asserted the Defendants overlooked. First, the Plaintiffs pointed to Mr. Surti's deposition testimony that Mr. Winfree and later Orlandus Majors, the TBON loan officer responsible for the Foster Loan after Mr. Winfree left TBON, told Mr. Surti that he did not need to make any more payments on the Foster Loan until it was refinanced. Second, the Plaintiffs disputed that the Second Forbearance Agreement negotiations with TBON were at an impasse because, according to Mr. Surti, the essential terms of the agreement had already been agreed upon. Mr. Surti stated in his Affidavit submitted to the trial court that "[a]t this point in the negotiations the only unresolved language in the agreement was contained in paragraph 9, and pertained to how [TBON] would report the transaction to the various credit reporting agencies." Mr. Surti also attested that he was never told of the March 7 deadline to execute the agreement or pay the deposit. He stated the following:

19. On March 6, 2003 [TBON] sent a final draft of the Forbearance and Release Agreement. March 6, 2003 was a Thursday. The morning of Friday, March 7, 2003, I met with a roofer at the Foster Business Park property during which time I went up and down the ladder which provided access to the roof. In late 2002, I had stomach surgery. The ladder climbing aggravated the area and I began to experience severe cramps. I immediately went to see my physician, Dr. Wasudev at Skyline Medical Center who was also a family friend. Dr. Wasudev advised me to rest and take pain killers until the pain resolved. Due to the illness, I was unable to discuss the forbearance agreement with Foster Business Park's attorney, Joe Rusnak or to respond to [TBON] until March 10, 2003. There was no deadline to execute the agreement ever communicated to me.

20. Pursuant with the terms of the Forbearance Agreement, I had been able to locate sufficient financing to pay off the Note for the agreed amount of $1,000,000.00.

21. On March 10, 2003 at 10:53 a.m. before I could respond, [TBON] informed Foster Business Park, via letter form Charles Reasor, III to Joe Rusnak, that it was no longer willing to discuss a forbearance agreement with the borrower and guarantors, and that it had begun the process of enforcing fully its rights under the loan documents.

Finally, the Plaintiffs made conclusory allegations that Mr. Winfree must have obtained confidential information about Foster and Mr. Surti that he used to interfere with Mr. Surti's negotiations with TBON in an attempt to produce additional evidence to support their contention that there are material facts in dispute. The Plaintiffs argued that Mr. Winfree and Mr. Lowe must have had and shared confidential information with each other "as evidenced by the timing of the option to purchase and later proposed purchase agreement sent by Mr. Lowe to Mr. Surti." The Plaintiffs

also stated in their Response to the Defendants' Statement of Undisputed Facts that "it is clear [Ms. Hackett] was having ongoing communications with Winfree regarding First State Bank's purchase of the note" because of an unauthenticated email allegedly sent by Ms. Hackett to Mr. Winfree on March 11, 2003, with the statement "F.Y.I." and a confidentiality agreement attached. The conclusory nature of these statements do not provide new facts or highlight any overlooked facts.

The trial court found that the Plaintiffs did not have competent proof to show that Mr. Winfree, AHI or Mr. Lowe received confidential information from TBON or any source which would have facilitated their intervention in the forbearance agreement negotiations nor did they have competent information to show that Mr. Winfree, AHI or Mr. Lowe actually intervened in the forbearance agreement negotiations. The trial court found the following undisputed facts:

> Mr. Surti believes that Ms. Hackett gave Mr. Winfree confidential information about his negotiations with TBON. Foster and Mr. Surti do not however, come forward with proof that wrongful communications took place between Ms. Hackett and Mr. Winfree. Mr. Winfree states that he did not have details about the [sic] TBON's position except that which Mr. Surti gave him when he was seeking a loan from First State Bank. Mr. Surti continued to pursue a loan from First State Bank. In February of 2003, Mr. Surti contacted a second First State Bank loan officer, Mr. Latimer, to again discuss financing of a negotiated pay off to TBON. Mr. Surti gave Mr. Latimer his personal financial statement and the first two pages of his 2001 personal tax return and asked that they be kept confidential. After a review of these papers, Mr. Lattimer advised Mr. Surti that his bank could not help. Mr. Lattimer states that he did not share this financial statement or tax return with Mr. Winfree. He was not aware that Mr. Surti's request for financing had already been rejected by Mr. Winfree. Ms. Hackett did not provide Mr. Winfree with customer information and did not discuss Mr. Surti's financial condition or the negotiation detail with Mr. Winfree. Mr. Surti has a suspicion that confidential information was provided Mr. Winfree and Mr. Lowe by Ms. Hackett but he does not have competent proof that sensitive information went from Ms. Hackett to Mr. Winfree or from Mr. Winfree to Mr. Lowe or any other person.

The trial court granted summary judgment concluding that,

> Mr. Surti and Foster do not have competent proof to show that Mr. Winfree, [AHI] or Mr. Lowe received confidential information from TBON (a non-party) which facilitated their intervention in [Second] Forbearance Agreement negotiations. Mr. Surti and Mr. [sic] Foster do not have competent information to show that Mr. Winfree, [AHI] or Mr. Lowe did intervene in the [Second]Forbearance Agreement negotiations. It was Mr. Surti's failure to execute and act upon the Second Forbearance Agreement between March 7 and March 14, 2003, that caused TBON to sell the note to AHI. After March 7, 2003, TBON withdrew from its settlement negotiations with Mr. Surti and Foster because Mr. Surti did not accept the offer and

did not perform as required by TBON. Consequently, the Plaintiffs' damages were caused by the default under the loan terms.

We agree with the trial court's conclusions. Accepting the evidence the Plaintiffs put forth in response to the Defendants' motion for summary judgment as true, *see McCarley*, 960 S.W.2d at 588 (the nonmoving party's evidence must be accepted as true), the evidence does not discredit or counter the Defendants' evidence negating an essential element of Plaintiffs' claim – that the Defendants were not the cause of the Plaintiffs' damages. Mr. Winfree testified in his deposition that he did not tell Mr. Surti that Foster could stop making payments on the Foster Loan. Moreover, the Defendants point to the Foster Loan documents, which provide that "neither the terms of the Loan nor this Note may be modified, extended, changed, amended or terminated except in writing"; the Plaintiffs never alleged that Mr. Winfree or anyone at TBON had reduced any of their alleged conversations about Foster being able to stop making payments in writing. Also, Ms. Hackett testified in her deposition that it was the actions of Mr. Surti, or lack thereof, that influenced her to end the Second Forbearance Agreement negotiations and that neither Mr. Surti nor Foster's attorney attempted to explain the lack of payment on March 7 or to resolve the issue by either making the $200,000 payment or signing the Second Forbearance Agreement. Therefore, we affirm the judgment of the trial court.

## ii. Billy Lowe and J&B Investments, Inc.

The Plaintiffs allege that Mr. Lowe and J&B Investments conspired with Mr. Winfree and AHI to interfere with his forbearance negotiations with TBON. The trial court found that the Dismissal Order which granted summary judgment to Mr. Winfree and AHI warranted an award of judgment as to Mr. Lowe and J&B Investments as a matter of law. Based on our discussion of an actionable civil conspiracy above and because we have affirmed trial court's judgment that neither Mr. Winfree nor AHI committed the tort of intentional interference of a business relationship, we find that summary judgment was proper as to the alleged civil conspiracy by Mr. Lowe and J&B Investments to interfere with Foster's and Mr. Surti's business relationship with TBON.

### 3. Tennessee Consumer Protection Act

The Plaintiffs alleged in the Complaint that the conduct of the Defendants "constitutes unfair and/or deceptive acts or practices in violation of the Tennessee Consumer Protection Act and a civil conspiracy to commit those acts" and sought $2 million in compensatory damages and $2 million in punitive damages as well as treble damages and attorney's fees as provided by the T.C.P.A. The Complaint does not explain which alleged facts actually constitute the unfair and/or deceptive acts or practices. On appeal, the Plaintiffs contend that the trial court erred in granting summary judgment of the violation of T.C.P.A. claim because there are "disputed facts regarding disclosure of confidential information known by Mr. Winfree about the [Plaintiffs] and use of the information to the benefit of the [Defendants] and to the detriment of the [Plaintiffs]." It appears from the pleadings that the essence of the Plaintiffs' claim for violations of the T.C.P.A. is that the Plaintiffs

allegedly gave the Defendants "confidential financial and business information" which was allegedly utilized for the Defendants' financial gain.

The T.C.P.A. was enacted to provide statutory remedies beyond common-law fraud actions for consumers and legitimate business enterprises victimized by unfair or deceptive business acts or practices that were committed in Tennessee in whole or in part. *See* Tenn. Code Ann. § 47-18-102; *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005). The T.C.P.A. applies to any "act or practice which is unfair or deceptive to the consumer or to any other person." Tenn. Code Ann. § 47-18-104(b)(27). In order to recover under the T.C.P.A., "the plaintiff must prove: (1) that the defendant engaged in an unfair and deceptive act or practice declared unlawful by the T.C.P.A. and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated....'" *Tucker*, 180 S.W.3d at 115 (*citing* Tenn. Code Ann. § 47-18-109(a)(1)).

The T.C.P.A. does not define the key terms "unfair" and "deceptive," making the determination whether a particular act or practice is unfair or deceptive a legal matter to be decided by the court. *See Tucker*, 180 S.W.3d at 116. However, whether a specific representation in a particular case is "unfair" or "deceptive" is a question of fact. *Id.*; *see Davidson v. General Motors Corp.*, 786 N.E.2d 845, 851 (Mass. App. Ct. 2003). The General Assembly has instructed us to look to the federal understanding of these terms in interpreting them in the T.C.P.A. *See* Tenn. Code Ann. § 47-18-115.[18] "A deceptive act or practice is one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact." *Tucker*, 180 s.W.3d at 116; *see* Jonathan Sheldon & Carolyn L. Carter, *Unfair and Deceptive Acts and Practices* § 4.2.3.1, at 118-19 (5th ed. 2001). The concept of unfairness is broader than the concept of deceptiveness and "it applies to various abusive business practices that are not necessarily deceptive." *Id.*; *see Unfair and Deceptive Acts and Practices* § 4.2.3.1, at 156. "An act or practice should not be deemed unfair 'unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.'" *Id.* (citing 15 U.S.C.A. § 45(n)).

i. Mark Winfree

Mr. Winfree contends that he was never given nor obtained any confidential information regarding Foster or Mr. Surti. In his Motion for Summary Judgment, Mr. Winfree pointed to Mr. Surti's contradictory deposition testimony in which he first stated that he told Mr. Winfree about the $1 million forbearance agreement negotiations with TBON then later stated that he did not tell Mr. Winfree about the negotiations, but that he assumed someone else did. Ms. Hackett testified in her deposition that she did not tell Mr. Winfree about the Second Forbearance Agreement negotiations

---

[18] The T.C.P.A. explicitly provides that it is to be "interpreted and construed consistently with the interpretations given by the federal trade commission and the federal courts pursuant to § 5(A)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1))." Tenn. Code Ann. § 47-18-115.

between TBON and Mr. Surti. Mr. Winfree also pointed to Mr. Surti's deposition testimony that Mr. Surti provided the same allegedly confidential information (i.e., $3.2 million appraisal from 1997, the fact that the Foster Loan was in default, etc.) to Mr. Lowe. Mr. Winfree also pointed to Mr. Surti's deposition testimony where Mr. Surti explained that he intended Mr. Winfree to be a "resource" for him and to talk to the other prospective banks from which Mr. Surti sought financing to pay off the Foster Loan. Mr. Winfree testified in his deposition that he did not share any of the information Mr. Surti told him with Mr. Lowe or AHI nor did he receive any confidential information about Foster or Mr. Surti from Ms. Hackett, Mr. Lattimer or any other source. Both Ms. Hackett's deposition testimony and Mr. Lattimer's affidavit confirm that they did not provide Mr. Winfree with any confidential information about Foster or Mr. Surti.

We find that Mr. Winfree produced evidence that negated an essential element of the Plaintiffs' claim of violation of the T.C.P.A. – that Mr. Winfree could not have disclosed or misused information he did not have to the Plaintiffs' detriment. Having negated an essential element to the Plaintiffs' claim, the burden of production shifted to the Plaintiffs to (1) point to evidence establishing material factual disputes that were over-looked or ignored by the moving party; (2) rehabilitate the evidence attacked by the moving party; (3) produce additional evidence establishing the existence of a genuine issue for trial; or (4) submit an affidavit explaining the necessity for further discovery pursuant to Tenn. R. Civ. P., Rule 56.06. *See McCarley*, 960 S.W.2d at 588. The Plaintiffs failed to do so. In their Response to Mr. Winfree's Statement of Undisputed Facts in support of his motion for summary judgment, the Plaintiffs made a mere conclusory remark suggesting that the existence of a March 11, 2003, email from Ms. Hackett to Mr. Winfree which read "F.Y.I." and supposedly attached a February 10 that included a confidentiality agreement was evidence that she and Mr. Winfree were having ongoing communications regarding First State purchasing the note.[19] At the time Ms. Hackett sent the February 10 email, First State was considering purchasing the Foster Loan. The March 11 email, however, was never authenticated and Mr. Winfree's attorney objected to the Plaintiffs' attorney's representation that the confidentiality agreement was attached to the March 11 email. The Plaintiffs produced no other evidence of communication between Ms. Hackett and Mr. Winfree after Mr. Winfree informed her in mid-February that First State would not purchase the Foster Loan. The Plaintiffs also produced no evidence that Mr. Winfree shared the Foster Loan's principal amount that he received from Ms. Hackett in mid-February with Mr. Lowe.

In the Memorandum and Order of Dismissal the trial court found:

Because there is no proof of causation, the [P]laintiffs's claims under the Tennessee Consumer Protection Act are dismissed. Tenn. Code Ann. § 47-18-109 requires that

---

[19] The March 11 email and confidentiality agreement were shown to Mr. Winfree during his deposition and marked as collective deposition Exhibit 37. Mr. Winfree's attorney objected to the Plaintiffs' attorney's initial representation that the confidentiality agreement was actually attached to the email because there was no indication that the two were originally attached and did not have contiguous pagination. The Plaintiffs' attorney contended that the documents came from TBON through the discovery process, but a second Plaintiffs' attorney admitted that they did not come from TBON stapled together, but rather he had stapled them together.

Mr. Surti and Foster show they suffered . . . "an ascertainable loss of money . . . or thing of value . . . as a result of the use or employment by another person of a unfair or deceptive act . . . [.]" The Court does not search for deceit or other wrongdoing where there is only speculative proof of causation, as in this case.

Given the Plaintiffs' mere conclusory allegations and failure to point to any overlooked facts, rehabilitate or produce new evidence, or establish the need for additional discovery, we find summary judgment was proper; consequently we affirm the judgment of the trial court.

ii.  Mr. Lowe and J&B Investments, Inc.

The Plaintiffs allege that Mr. Lowe and J&B Investments conspired with Mr. Winfree resulting in the violation of the T.C.P.A.  The trial court found that the Dismissal Order which granted summary judgment to Mr. Winfree warranted an award of judgment as to Mr. Lowe and J&B Investments as a matter of law.  Based on our above discussion of civil conspiracy and because we have affirmed trial court's judgment that Mr. Winfree did not violate the T.C.P.A., we find that summary judgment was proper as to the alleged civil conspiracy by Mr. Lowe and J&B Investments.

### III.  Conclusion

For the foregoing reasons, the judgment of the trial court granting summary judgment to Mark Winfree, Billy Lowe, American Holdings Investments, Inc., and J&B Investments, LLC, and dismissing this case is affirmed.  The case is remanded to the Chancery Court for Davidson County for collection of costs accrued therein.

Costs of this appeal are assessed to Plaintiffs, Foster Business Park, LLC, Arte' Corporation, Tarun Surti, and Lata Surti, and their surety.

_____
RICHARD H. DINKINS, JUDGE